AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>BLACK 2014 CHEVROLET CRUZE LS WITH<br>FLORIDA LICENSE PLATE PK957D AND<br>VIN #1G1PA5SG937283380 | )<br>)<br>)<br>)<br>)<br>)    Case No. 21-sw-47 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the _____ District of _____ Columbia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

❑ contraband, fruits of crime, or other items illegally possessed;

❑ property designed for use, intended for use, or used in committing a crime;

❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute and Distribution of Controlled Substances |
| 21 U.S.C. § 846 | Conspiracy to Commit Such Offenses |

The application is based on these facts:

See Attached Affidavit.

❑ Continued on the attached sheet.

❑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Jerrod C. Hughes A336*

*Applicant's signature*

Jerrod C. Hughes, Task Force Officer, DEA

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means).*

Date: _____ 02/12/2021 _____

*Judge's signature*

City and state:  District of Columbia _____   Robin M. Meriweather, U.S. Magistrate Judge

*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means          ☑ Original          ❏ Duplicate Original

# UNITED STATES DISTRICT COURT
## for the
### District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )   Case No.  21-sw-47 |
| BLACK 2014 CHEVROLET CRUZE LS WITH | ) |
| FLORIDA LICENSE PLATE PK957D AND | ) |
| VIN #1G1PA5SG937283380 | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

          An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____Columbia_____
*(identify the person or describe the property to be searched and give its location)*:

    See Attachment A.


          I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

    See Attachment B.



          **YOU ARE COMMANDED** to execute this warrant on or before     February 25, 2021     *(not to exceed 14 days)*
    ❏ in the daytime 6:00 a.m. to 10:00 p.m.     ☑ at any time in the day or night because good cause has been established.

          Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

          The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to     Robin M. Meriweather     .
                                                                                                          *(United States Magistrate Judge)*

          ❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
    ❏ for _____ days *(not to exceed 30)*  ❏ until, the facts justifying, the later specific date of _____ .


Date and time issued:     02/12/2021     _____
                                                                                              *Judge's signature*

City and state:   District of Columbia     Robin M. Meriweather, U.S. Magistrate Judge
                                                                                              *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  21-sw-47 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|
| <br>        I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.<br><br><br>Date: _____<br>*Executing officer's signature*<br><br>_____<br>*Printed name and title* |

## ATTACHMENT A

*Vehicle to be searched*

The vehicle to be searched is described and pictured below:

A black 2014 Chevrolet Cruze LS with Florida license plate PK957D with VIN# 1G1PA5SG937283380, currently stored in a secure location in Washington, D.C.



## ATTACHMENT B

*Items to be Seized*

The items to be seized are fruits, evidence, records and information relating to, contraband, or instrumentalities of violations of Title 21, United States Code, Section 841(a)(1) (distribution, and possession with intent to distribute controlled substances) including, but not limited to:

a.  Controlled substances, packaging materials, indicia of distribution, records and documents, receipts, notes ledgers and other papers including any computerized or electronic records including cellular telephones, relating to the ordering, purchase or possession of controlled substances;

b.  U.S. currency and other illicit gains from the distribution of controlled substances;

c.  Address and/or telephone books and papers, including computerized or electronic address and/or telephone records reflecting names, addresses and/or telephone numbers;

d.  Books, records, receipts, bank statements, and records, money drafts, and any other items evidencing the obtaining, secreting, transfer, concealment, storage and/or expenditure of money or other assets including, but not limited to, controlled substances;

e.  Documents and papers evidencing ownership of proceeds from the sale of controlled substances, storage and location of such assets and facilities to safely store and secure such items, such as safes, to include lock boxes, and strong boxes;

f.  Photographs, in particular, photographs of controlled substances and photographs of individuals possessing controlled substances and photographs showing the association of individuals;

g.  Indicia of occupancy, residence, and/or ownership of the premises described herein, including, but not limited to, utility and telephone bills, cancelled envelopes, and keys;

h.  Cellular phones, computers, and other electronic storage media or digital devices;

i.  For any electronics searched, any conversations, whether through text messages or other applications, where the purchase and sale of cocaine and other controlled substances was discussed;

j.  For any electronics searched, any photographs of controlled substances.

For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.  evidence of the lack of such malicious software;

2

d.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  records of or information about Internet Protocol addresses used by the COMPUTER;

l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

m. contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media

3

that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, including "smart" phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) |
| ERICKA SHEREE OLIVER | ) |
| and | ) |
| TAUREAN ALPHONSO VENABLE | ) |
| | ) |
| | ) |

Case No.   1:21-MJ-26

**UNDER SEAL**

```
F I L E D
FEB - 8 2021
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA
```

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___April 2019 through the present___ in the county of ___Arlington___ in the
___Eastern___ District of ___Virginia___ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 846 | Conspiracy to distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl. |

This criminal complaint is based on these facts:

SEE AFFIDAVIT

☑ Continued on the attached sheet.

Reviewed by AUSA/SAUSA:

Bibeane Metsch

Sworn to before me and signed in my presence.

*Complainant's signature*

Stacey Ivie, DEA Task Force Officer

*Printed name and title*

Date: ___02/08/2021___

City and state: ___Alexandria, Virginia___

/s/

John F. Anderson
United States Magistrate Judge

*Judge's signature*

Honorable John F. Anderson, U.S. Magistrate Judge

*Printed name and title*

UNDER SEAL

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division



UNITED STATES OF AMERICA

v.

ERICKA SHEREE OLIVER

and

TAUREAN ALPHONSO VENABLE,

*Defendants.*

**UNDER SEAL**

Case No. 1:21-mj-26

## AFFIDAVIT IN SUPPORT OF
## ARREST WARRANTS AND CRIMINAL COMPLAINT

I, Stacey Ivie, being duly sworn, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an arrest warrant and criminal complaint charging

Ericka Sheree OLIVER, also known as "Chip," (hereinafter referred to as "OLIVER") and Taurean

Alphonso VENABLE, also known as "Tip" (hereinafter referred to as "VENABLE") with

conspiracy to distribute 400 grams or more of a mixture and substance containing a detectable

amount of N-phenyl-N- [ 1- ( 2-phenylethyl ) -4-piperidinyl ] propanamide, commonly referred to

as fentanyl, a Schedule II controlled substance, in violation of Title 21, United States Code,

Sections 841(a)(1) and 846.  It is part of the conspiracy that OLIVER, VENABLE, and others,

both known and unknown, acquire fentanyl and press illicit pills containing fentanyl among other

substances to resemble prescription pills including Oxycodone, Percocet, and Xanax for monetary

gain.

1

2.      I am a Police Detective with the Alexandria Police Department, ("APD"), where I have been employed since 2002.  During my employment with the APD, I have been a detective for over fourteen (14) years and have investigated numerous types of crimes, including but not limited to fraud, money laundering, narcotics and organized crime. I have conducted and/or participated in numerous narcotics investigations resulting in the arrest and/or conviction of drug distributors and the seizure of quantities of controlled substances and other evidence affiliated with drug distribution. I am deputized as a Task Force Officer by the Drug Enforcement Administration ("DEA").  Since November 19, 2011, I have been assigned to the High Intensity Drug Trafficking Area ("HIDTA") Task Force, Northern Virginia Financial Initiative ("NVFI") in Annandale, Virginia.

3.      Based upon my experience in narcotics investigations, I have become familiar with the patterns of activity of narcotics traffickers; the types and amounts of profits typically made by narcotics traffickers; and the methods, language, and terms used to disguise the source and nature of proceeds of narcotics trafficking and associated money laundering schemes.  In addition, I have learned that it is common for narcotics traffickers to (1) "front" (or provide on consignment) controlled substances to their customers; (2) conceal contraband, proceeds of narcotics sales, and records of narcotics transactions in secure locations within their residences, vehicles and/or their businesses for ready access; (3) conceal proceeds from law enforcement authorities and rival narcotics traffickers; and (4) use digital display cellular telephones and text messaging/peer-to-peer messaging to facilitate their narcotics distribution operations.

4.      This affidavit contains information necessary to support probable cause to charge OLIVER and VENABLE.  It is not intended to include each fact and matter observed by or known to the United States. The facts and information contained in this affidavit are based upon my

personal knowledge, information obtained from state and federal law enforcement officers, and information provided by cooperating witnesses and/or sources.

## USE OF CONFIDENTIAL SOURCES

5.      During the course of this investigation, investigators have two (2) cooperating source (hereinafter, "CS-1" and "CS-2"). For purposes of this affidavit, the cooperating sources will be referred to in the masculine gender regardless of their true gender. The information provided by the cooperating sources has been corroborated by debriefings, text messages, and/or other means. To my knowledge, none of the information provided by any cooperating sources has proved to be false, misleading, or inaccurate in any material respect.

6.      CS-1 started cooperating with law enforcement in 2020. CS-1 is an admitted distributor of "Molly," heroin, and fentanyl and has a prior drug distribution conviction. CS-2 also started cooperating with law enforcement in 2020 and is an admitted drug distributor of fentanyl with no prior criminal history. CS-1 and CS-2 are cooperating with law enforcement in hopes of receiving credit for cooperation after pleading guilty to federal drug trafficking charges in this District.   CS-1 and CS-2 have provided information to law enforcement that has been independently corroborated.

## PROBABLE CAUSE

A.      Background of the Investigation

7.      In early 2020, law enforcement obtained information about subjects distributing quantities of controlled substances in the Eastern District of Virginia and elsewhere. During the course of this investigation, law enforcement has seized large quantities of fentanyl and other controlled substances, along with corresponding evidence that identified OLIVER and VENABLE as conspiring with others to distribute controlled substances.

3

B.     Seizure of Fentanyl on June 1, 2020

8.     On June 1, 2020, law enforcement officers executed a search warrant at an address in Arlington, Virginia where CS-1 was residing. During the execution of the search warrant, law enforcement found evidence consistent with the manufacturing and packaging of suspected controlled substances in almost every room of the three-bedroom apartment. White powder was prevalent throughout and covered many items. There were also numerous boxes and/or containers of corn starch, cellulose, caffeine tablets, and Magnesium Sulfate, among other materials which, based on my training and experience, are used as cutting agents by drug traffickers.

9.     In the kitchen area, law enforcement located numerous mixing containers, grinders, scales, and packaging materials with suspected narcotics residue. A search of the middle island cabinet revealed an empty package displaying LFA Machines, a company that manufactures pill presses. In the kitchen garbage, officers located additional large amounts of powder, along with shipping labels and several discarded tablets with markings consistent with controlled prescription tablets. Officers located a machine suspected of being used to press kilogram quantities of narcotics known as a "kilo press" in the kitchen island cabinet. In addition, officers found a blender on the kitchen counter containing a large amount of powder. On July 7, 2020, law enforcement received results of a qualitative analysis, including net weight and identification, conducted by the Mid-Atlantic Laboratory of the DEA. The analysis reflected that the contents of the blender weighed approximately 1,082 grams and was positive for fentanyl[1].

---

[1] Based on my training and experience, fentanyl is commonly mixed with or substituted for other opioids in counterfeit tablets purporting to be, for example, Oxycodone.

10.     CS-1, the renter of the apartment was subsequently arrested and charged federally in this District with drug trafficking. CS-1 later agreed to cooperate with law enforcement in hopes of consideration at sentencing.

C.     Seizure of Fentanyl on June 2, 2020

11.     While the search warrant was being executed on June 1, 2020 in Arlington, Virginia, officers located a vehicle associated with CS-1 parked in the garage of the apartment building.

12.     A K-9, Arlo,[2] and his handler conducted a sweep of the vehicle which resulted in a positive alert by Arlo. Following the alert, this vehicle was secured and towed (followed by law enforcement) to the Arlington County Police Department's impound lot.

13.     On June 2, 2020, officers obtained and executed a search warrant of this vehicle. Inside the trunk, officers found one (1) heat sealed black and clear package containing thousands of tablets with markings consistent with those of Percocet, a prescription controlled substance. Law enforcement also found two (2) heat sealed packages with shapes consistent with the packaging for a kilogram of a controlled substance. One of these packages was silver and the other was clear with a visible white block with an Audi vehicle emblem imprinted on it.

14.     On July 6, 2020, law enforcement received the results of a qualitative analysis, including net weight and identification, conducted by the Mid-Atlantic Laboratory of the DEA. The analysis reflected that the contents of the clear heat-sealed package containing the white substance with the Audi emblem weighed 665.7 grams (without packaging) and was positive for fentanyl and xylazine. Another qualitative analysis conducted by the Mid-Atlantic Laboratory of

---

[2] "Arlo" was last certified in April 2019 to alert to the odors of substances including heroin, cocaine, and methamphetamine and is trained on a monthly basis to ensure Arlo's accuracy. Arlington County, Virginia Police Office Anatoliy Biskoup is Arlo's handler.

the DEA Administration reflected the silver heat sealed package weighed 1007.0 grams (without packaging) and was positive for fentanyl.

D.   Historical Information Provided by CS-1 regarding OLIVER and VENABLE

15.   CS-1 has known OLIVER for several years and began to obtain controlled substances, including fentanyl and carfentanil, with and for her in approximately 2017.   He explained that OLIVER also goes by the name "Chip." CS-1 and OLIVER utilized the "dark web" to order carfentanil, a fentanyl analogue, which was shipped to various locations in the Washington, D.C. Metropolitan Area.

16.   In approximately 2019, CS-1 and OLIVER both began to obtain large quantities of fentanyl, which they used to press pills similar to those seized from CS-1 in June 2020.   CS-1 stated that both he and OLIVER obtained pill presses which they kept in their individual residences, along with the residences of others, to manufacture the pills.   CS-1 was aware that OLIVER had obtained a pill press from LFA Machines, that had been shipped to an associate of OLIVER in Washington, D.C. in 2020.

17.   According to CS-1, OLIVER worked directly with VENABLE and an additional unindicted co-conspirator (hereinafter, "UCC-1") to manufacture and distribute the pills pressed with fentanyl.

18.   CS-1 related that in 2020, he (CS-1), OLIVER and UCC-1 "pooled" $90,000 to purchase one and a half (1.5) kilograms of fentanyl to manufacture pills.

19.   CS-1 stated that OLIVER also had her own sources of supply for large quantities of heroin, cocaine, and fentanyl.   CS-1 had observed OLIVER with up to two (2) kilograms of suspected fentanyl on at least one (1) occasion.   CS-1 also had obtained a kilogram of fentanyl

from his source of supply for OLIVER.   CS-1 also observed OLIVER with thousands of manufactured pills.

20.     CS-1 stated that VENABLE distributed the manufactured pills, along with other controlled substances, at the direction of OLIVER.   VENABLE also assisted OLIVER in manufacturing the pills.  According to CS-1, OLIVER obtained an apartment for herself and for VENABLE in the same building where CS-1 resided where law enforcement executed the search warrant on June 1, 2020.

21.     CS-1 also had previously "fronted" OLIVER approximately two hundred  (200) grams of suspected fentanyl, up to ten thousand (10,000) pills containing fentanyl, and numerous bottles of Promethazine with Codeine.  OLIVER currently owes CS-1 approximately $45,000 for the "fronted" drugs.

22.     CS-1 had CS-2 assist OLIVER in making repairs to her pill press when it was kept in her apartment in Arlington, Virginia.

23.     CS-1 stated that on June 1, 2020, after learning of law enforcement presence and prior to the execution of the search warrant, CS-1 alerted OLIVER.  OLIVER then removed from CS-1's residence a large bag with at least ten thousand (10,000) pills containing fentanyl that CS-1 had manufactured, along with approximately $330,000 in drug proceeds.

24.     CS-1 communicated with OLIVER on various phone numbers including 202-***-9772 and 202-***-0062.  Communications between CS-1 and OLIVER were found on CS-1's cellular devices.

25.     CS-1 identified OLIVER as the source of supply of 665.7 grams of the mixture and substance containing fentanyl with the Audi emblem seized from his Chevrolet Monte Carlo.

26.      CS-1 knew that OLIVER was paying the rent and had obtained the apartment in Arlington, Virginia for VENABLE.   VENABLE uses a vehicle that previously belonged to OLIVER and was titled in the name of OLIVER's close relative.  Law enforcement surveillance on January 8, 2021 confirmed VENABLE was still driving this vehicle.

27.      CS-1 provided that VENABLE was receiving thousands of pills containing fentanyl from OLIVER, which he further distributed to customers that met him in Arlington, Virginia and Washington, D.C.

28.      CS-1 stated that VENABLE went by the nickname "Tip," and he was also involved in the distribution of other controlled substances, including cocaine, with OLIVER and UCC-1. CS-1 identified VENABLE's phone number as 202-***-0357.

E.      Communications between CS-1 and OLIVER

29.      Following the encounter with law enforcement in June 2020, law enforcement seized various electronic devices from CS-1.  A search of CS-1's cellular telephones revealed communications corroborating CS-1's statements regarding OLIVER and VENABLE and their distribution of heroin and fentanyl.  The following table identifies communications regarding the purchase of carfentanil and fentanyl between CS-1 and OLIVER who was using the cellular phone numbers 202-***-9772 and 202-***-0062.

30.      On June 30, 2017, CS-1 and OLIVER exchanged the following messages:

| DATE | FROM | MESSAGE |
|------|------|---------|
| 06/30/17 | OLIVER |  |
| 06/30/17 | OLIVER | He just had some shit delivered |

| 06/30/17 | OLIVER | I think he got escrow on the bay |
|----------|--------|--------------------------------|

31.     Through my knowledge of this investigation and discussions with CS-1, during this exchange, OLIVER is sharing communications and postings from the "dark web" regarding the sale of carfentanil.  OLIVER further advised CS-1 that a subject had already received a delivery. "Bay" is believed to refer to the "dark web" site "AlphaBay" which was subsequently shut down by law enforcement for the distribution of illegal controlled substances, among other offenses.

32.     On November 10, 2019, CS-1 and OLIVER exchanged the following messages:

| DATE | FROM | MESSAGE |
|------|------|---------|
| 11/10/19 | CS-1 | It made 1650 10's |

33.     Through my knowledge of this investigation and discussions with CS-1, during this exchange, CS-1 advised OLIVER that one thousand six hundred and fifty ("1650") fentanyl pills were able to be manufactured using a pill press.   During the exchange, "10's" refers to manufactured pills with markings consistent with oxycodone.   When CS-1 was arrested, similar pills were found and CS-1 admitted to manufacturing fentanyl pills consistent with the "10's."

34.     On December 15, 2019, CS-1 and OLIVER exchanged the following messages:

| DATE | FROM | MESSAGE |
|---|---|---|
| 12/15/19 | CS-1 |  |
| 12/15/19 | OLIVER | It look dumb |
| 12/15/19 | OLIVER | But you wanna get that? |
| 12/15/19 | CS-1 | Meatball said it's small like the pink |
| 12/15/19 | CS-1 | But when it's not on the joint I be ordering from |
| 12/15/19 | OLIVER | Oh ok they prolly ain't get it yet lol |
| 12/15/19 | OLIVER | We can get it custom made |
| 12/15/19 | CS-1 | Yeah I'm sure we can |
| 12/15/19 | CS-1 | I emailed the dude already |
| 12/15/19 | OLIVER | Did y'all do any today |
| 12/15/19 | CS-1 | We really just now getting 2 it |

| 12/15/19 | CS-1 | Outta 1050 that I had only 226 was good |
|---|---|---|
| 12/15/19 | CS-1 | Them bottles ain't no good for those |
| 12/15/19 | OLIVER | I don't think it's the bottles tho |
| 12/15/19 | OLIVER | It's the pills itself |
| 12/15/19 | OLIVER | They be doing the same shit in the bag |
| 12/15/19 | OLIVER | It's the pressure |
| 12/15/19 | OLIVER | If they wasn't gonna break they wouldn't |
| 12/15/19 | OLIVER | We gotta figure out a better way to add more pressure |
| 12/15/19 | CS-1 | No it's not tho cause the ones that wasn't packed tight didn't break |
| 12/15/19 | OLIVER | I think it's the pressure |
| 12/15/19 | OLIVER | Think about the 1s I got in the bad |
| 12/15/19 | OLIVER | They no good |
| 12/15/19 | CS-1 | That's the thing none look like that |
| 12/15/19 | CS-1 | The top was breaking them |
| 12/15/19 | OLIVER | Oh ok I don't thinkit's the bottle tho I think they pressure itself because remember @ 1st I couldn't break mines then after a while I could |
| 12/15/19 | CS-1 | But that's why cause how they packed it squeezing them with nowhere to go |
| 12/15/19 | CS-1 | He getting made over here cause I keep crushing shit down that ain't the right size |
| 12/15/19 | CS-1 | From now on if shit ain't what we want I'm not accepting it |
| 12/15/19 | OLIVER | No bullshit |
| 12/15/19 | CS-1 | Cause I real live just had to redo 800 |

35.     Through my knowledge of this investigation and discussions with CS-1, during this exchange, CS-1 sent OLIVER an image of the previously mentioned "10's" and details difficulties he had in manufacturing fentanyl pills. Both CS-1 and OLIVER attempt to deduce the reasoning behind the inconsistencies in the quality of the manufactured pills.

36.     On December 18, 2019, CS-1 and OLIVER exchanged the following messages:

| DATE | FROM | MESSAGE |
|---|---|---|
| 12/18/19 | OLIVER | What's the site you be grabbing the molds from |
| 12/18/19 | CS-1 | Tdptools |
| 12/18/19 | CS-1 | U got it? |

| 12/18/19 | OLIVER | Yea |
|----------|--------|-----|
| 12/18/19 | OLIVER | They come from China? |
| 12/18/19 | CS-1 | Yeah |
| 12/18/19 | CS-1 | But how they do it u wouldn't know |
| 12/18/19 | CS-1 | We need them other joints 2 that ur ppl be making |
| 12/18/19 | OLIVER | He said something about this |
| 12/18/19 | OLIVER |  |
| 12/18/19 | CS-1 | What's that |
| 12/18/19 | OLIVER | My folks who be doing Xanax |

| | | |
|---|---|---|
| 12/18/19 | OLIVER |  |
| 12/18/19 | CS-1 | Will he teach u? |
| 12/18/19 | OLIVER | Yea |
| 12/18/19 | OLIVER | But you know he be ordering this shit that's like $750 |
| 12/18/19 | OLIVER | That etizolam shit |
| 12/18/19 | OLIVER | Or however you spell it |
| 12/18/19 | CS-1 | For how many gs |
| 12/18/19 | OLIVER | Let me ask I forgot |
| 12/18/19 | OLIVER | Whatever it is it canmake 12 of them |
| 12/18/19 | CS-1 | 12k? |
| 12/18/19 | OLIVER | Can make 12k of them yea |

37.    Through my knowledge of this investigation and discussions with CS-1, during this exchange, CS-1 advised OLIVER where to obtain molds utilized to manufacture pills from "Tdptools." Also, OLIVER sent an image of a mold to CS-1 with markings consistent with those used on Xanax tablets. OLIVER tells CS-1 that she has an associate already making pills utilizing a press and molds. She relates that the associate was ordering "etizolam," which is chemically related to a class of controlled substances known as benzodiazepines. She states that

14

twelve thousand (12,000) pressed fake Xanax bars could be manufactured.

38.     Also on December 18, 2019, CS-1 and OLIVER exchanged the following

messages:

| DATE | FROM | MESSAGE |
|------|------|---------|
| 12/18/19 | OLIVER | I had him look for this a couple weeks ago shin |
| 12/18/19 | OLIVER |  |
| 12/18/19 | OLIVER | *ago |
| 12/18/19 | CS-1 | We need that |
| 12/18/19 | OLIVER | 1st person might be legit but the price cheap |
| 12/18/19 | CS-1 | How much |
| 12/18/19 | OLIVER | It says 12gs for 1k |

39.     Through my knowledge of this investigation and discussions with CS-1, during

this exchange, OLIVER shares an image of an ad for carfentanil.  OLIVER provides a price for

twelve (12) grams ("g") for a thousand dollars ("1k").

40.     On December 22, 2019, CS-1 and OLIVER exchanged the following messages:

| DATE | FROM | MESSAGE |
|------|------|---------|
| 12/22/19 | CS-1 |  |
| 12/22/19 | OLIVER | & blue & a white if you have it lol |
| 12/22/19 | CS-1 |  |
| 12/22/19 | CS-1 |  |

16

| 12/22/19 | OLIVER |  |
|----------|--------|---------|
| 12/22/19 | CS-1 | How big is that one? |
| 12/22/19 | OLIVER | Imma try to get it from her |
| 12/22/19 | OLIVER | & the yellow |
| 12/22/19 | CS-1 | Yeah I hit the dude up tld him I need some custom molds |
| 12/22/19 | CS-1 | He say $109 for any complete set |
| 12/22/19 | OLIVER | That's cheap |
| 12/22/19 | CS-1 | I'm hip |
| 12/22/19 | CS-1 | So as u get the measurements I'll send it and order it |
| 12/22/19 | CS-1 | Soon |
| 12/22/19 | CS-1 | But I was tellin u I got a yellow |
| 12/22/19 | CS-1 | Should be easy to make this one |

41.     Through my knowledge of this investigation and discussions with CS-1, during this exchange, OLIVER requests and received images from CS-1 of different types of manufactured pills resembling prescription medications.  OLIVER in turn provided an image of two different types of pills.  Both further discuss obtaining "molds" and the additional manufacturing of "yellow" pills.

42.     On April 24, 2020, CS-1 and OLIVER exchanged the following messages:

| DATE | FROM | MESSAGE |
|------|------|---------|
| 04/24/20 | CS-1 |  |
| 04/24/20 | OLIVER | They out of stock? |
| 04/24/20 | CS-1 | Yeah she just sent this today |
| 04/24/20 | OLIVER | That's fuckin crazy smh |
| 04/24/20 | OLIVER | I'm blown |
| 04/24/20 | OLIVER | Its always something |
| 04/24/20 | OLIVER | Now I can't do shit |
| 04/24/20 | CS-1 | That's the black piece right? |
| 04/24/20 | OLIVER | No blue |
| 04/24/20 | OLIVER | The piece I need basically |
| 04/24/20 | OLIVER | Or maybe I can get it on without it but prolly not |
| 04/24/20 | CS-1 | Vitamin Press got one |
| 04/24/20 | OLIVER | Its Friday I need it like asap |

| 04/24/20 | OLIVER | I have to get these (heart emoji) done |
|---|---|---|
| 04/24/20 | CS-1 | So if u change the other part u don't think the mold will hold still? |
| 04/24/20 | OLIVER | Imma be stripping the screw all over again |
| 04/24/20 | OLIVER | & imma have to take it out |
| 04/24/20 | OLIVER | @ this point idk |
| 04/24/20 | OLIVER | & the piece for the dye is connected to that part that's sold out |

43.     Through my knowledge of this investigation and discussions with CS-1, during this exchange, CS-1 shares tracking information for an order from LFA Machines which included an upper drift pin assembly.  Your affiant is aware that LFA Machines was utilized by both CS-1 and OLIVER to obtain pill presses and corresponding parts.  OLIVER further discusses her press needing repairs and her needing the necessary parts to repair it.

44.     On May 26, 2020, CS-1 and OLIVER exchanged the following message:

| DATE | FROM | MESSAGE |
|---|---|---|
| 05/26/20 | CS-1 | I just tlk to him he really don't think he did it.  I'm like bro it's a mold and can be replaced I swear I don't think I did.  I just sent his $ back I'll just replace it to keep the confusion down this shit here be too much goin to far. |

45.     Through my knowledge of this investigation and discussions with CS-1, during this exchange, CS-1 informs OLIVER about the previously mentioned repairs that CS-2 attempted to make to her pill press.

46.     On May 29, 2020, CS-1 and OLIVER exchanged the following messages:

| DATE | FROM | MESSAGE |
|---|---|---|
| 05/29/20 | CS-1 | Sent him the 385 |
| 05/29/20 | OLIVER | Send me the thing showing you sent it |
| 05/29/20 | OLIVER | And I need to do more yellow I only got 500 left |
| 05/29/20 | CS-1 | How many u tryna do? |

| 05/29/20 | OLIVER | Prolly like 10 |
| 05/29/20 | CS-1 | And if u drop it to me I'll try to do it tomorrow but it'll prolly be later in the day |

47.     Through my knowledge of this investigation and discussions with CS-1, during this exchange, CS-1 advised OLIVER that he only had five hundred (500) "yellow" left.  "Yellow" refers to yellow pills that were manufactured by CS-1 and OLIVER.  OLIVER confirms that she was trying to purchase more pills and CS-1 advises that he would attempt to manufacture them.

     G.     Communications between CS-1 and VENABLE

48.     On December 31, 2019, CS-1 and VENABLE exchanged the following messages:

| DATE | FROM | MESSAGE |
|---|---|---|
| 12/31/19 | VENABLE | I been in the house is them 400 10s bottle up |
| 12/31/19 | CS-1 | I'll send the bottles up there with them |
| 12/31/19 | VENABLE | Just put them in 200 a piece |
| 12/31/19 | CS-1 | She left that shit all together |
| 12/31/19 | VENABLE | Aite is the other stuff ready |
| 12/31/19 | CS-1 | Meet me at the spot |
| 12/31/1 | VENABLE | Coming down |

49.     Through my knowledge of this investigation and discussions with CS-1, during this exchange, VENABLE asked CS-1 about four hundred (400) "10s."  CS-1 instructed VENABLE to meet at his residence and VENABLE stated that he was "coming down".   Based on information from this investigation, VENABLE also has an apartment in the same building as CS-1, but on the sixteenth floor.  CS-1 resided on the second floor.

     H.     Historical Information provided by CS-2 regarding OLIVER and VENABLE

50.     CS-2 met both OLIVER and VENABLE through CS-1.  CS-2 knew that CS-1 was working directly with, and at times supplying, both OLIVER and VENABLE with large quantities of pressed pills containing fentanyl that CS-1 manufactured.

51.   According to CS-2, in 2020, he learned that OLIVER also possessed two (2) pill presses which she at times kept in her apartment in the same building as CS-1. CS-2, at the request of OLIVER and CS-1, attempted to make repairs on the pill presses at both OLIVER's apartment in Arlington, Virginia and her residence in Prince George's County, Maryland.

52.   CS-2 observed OLIVER with at least one to two thousand (1,000-2,000) pills pressed with fentanyl at her residence and had also observed her with pills provided by CS-1. CS-2 also observed OLIVER with precursor chemicals utilized to press pills.

I.   Business records obtained from LFA Machines

53.   Law enforcement served an administrative subpoena to LFA Machines regarding addresses associated with OLIVER which included a close relative's address in Fort Washington, Maryland. LFA Machines provided records that showed six (6) orders and deliveries of precursor chemicals including Firmapress white, Firmapress yellow, and MCC-01 to the Fort Washington, Maryland address in a name that was not associated to any residents. These orders/deliveries took place between January 31, 2020 and April 22, 2020.

J.   Communications between UCC-1 and OLIVER

54.   Pursuant to search warrants, law enforcement reviewed the contents of the cellular telephones seized from UCC-1 on October 11, 2019 in connection with UCC-1's arrest in another case. A phone download of one (1) of the phones found it to utilize cellular phone number 716-***-6209 and the e-mail address bmgshit@icloud.com. The other phone utilized cellular phone number 571-***-4377 and e-mail sparkz8122@cloud.com. The following tables contain communications between UCC-1 and OLIVER regarding suspected drug trafficking activities.

55.   On July 4, 2019, UCC-1 and OLIVER exchanged the following messages:

21

| DATE | FROM | MESSAGE |
| --- | --- | --- |
| 07/04/19 | UCC-1 | You got them blue things? |
| 07/04/19 | OLIVER | All out will have them again Saturday |
| 07/04/19 | UCC-1 | Aite lmk some just hit me for em |

56.     Through my knowledge of this investigation and discussions with CS-1, during this exchange, "blue things" refers to manufactured tablets resembling prescription controlled substances which actually contain fentanyl.

57.     On August 13, 2019, UCC-1 and OLIVER exchanged the following messages:

| DATE | FROM | MESSAGE |
| --- | --- | --- |
| 08/31/19 | OLIVER | Oh ok was tryna see if you still had that lil small machine |
| 08/31/19 | UCC-1 | Yea I still got it you need it? |
| 08/31/19 | OLIVER | Yea tip was tryna use it right quick |
| 08/31/19 | OLIVER | I was gonna ask if you could help him lol |

58.     Through my knowledge of this investigation, "lil small machine" refers to a pill press utilized to manufacture tablets with fentanyl.  OLIVER relates that "tip" was trying to use the press.  "Tip" is a known nickname utilized by VENABLE.

59.     On September 26, 2019, OLIVER and UCC-1 exchanged the following messages:

| DATE | FROM | MESSAGE |
| --- | --- | --- |
| 09/26/19 | UCC-1 | I just gave dude shit to my manz they was like naw go back to the other lol |
| 09/26/19 | OLIVER | From the 5-10? |
| 09/26/19 | UCC-1 | I gave him that pick [CS-1] gave me he was like naw they loving your homie shit Rn |
| 09/26/19 | OLIVER | That really shouldn't matter but just add 5 to it then lol |

| 09/26/19 | UCC-1 | I was like hold up but yea I gave his as it was |
| 09/27/19 | OLIVER | Lmmfao I thought you was saying they ain't like how you switched |
| 09/27/19 | UCC-1 | We definitely on point let's get money |

60.     Through my knowledge of this investigation and discussions with CS-1, during the exchange, UCC-1 tells OLIVER about customers comparing the quality of pills made by them to pills provided by CS-1.  When OLIVER talks about going "from the 5-10," OLIVER is referring to adding a larger amount of fentanyl to the ingredients utilized to make the pills.

K.     Information from Apple iCloud Search Warrants

61.     In September 2020, federal search warrants were obtained for Apple iCloud records pertaining to UCC-1, OLIVER, and VENABLE.  Law enforcement reviewed the materials provided by Apple (which ran until September 11, 2020), which included iMessages, chats, SMS, MMS, images, and other data.   During the review of the downloaded contents, several messages were located between UCC-1, OLIVER, and VENABLE which were indicative of suspected drug trafficking and corroborated previously mentioned details of the criminal conspiracy.

(i)     *UCC-1 iCloud messages with OLIVER*

62.     On February 23, 2020, UCC-1 and OLIVER exchanged the following messages:

| DATE | FROM | MESSAGE |
| --- | --- | --- |
| 02/23/20 | UCC-1 | You got a stack in here |
| 02/23/20 | OLIVER | Aght I'll get it later lol |
| 02/23/20 | OLIVER | Man I put some shit together Lastnight before I left that shit had me sick af |
| 02/23/20 | OLIVER | |

| | | |
|---|---|---|
| | | Make sure you put something over your face & hands |
| 02/23/20 | UCC-1 | Aite bet looks too my nigg this joint bout to get me right |

63.     Through my knowledge of this investigation, during this exchange OLIVER is advising UCC-1 about the effects of manufacturing pills based on the adverse reactions to the fentanyl.  "Put some shit together" refers to making pills.

64.     On February 24, 2020, UCC-1 and OLIVER exchanged the following messages:

| DATE | FROM | MESSAGE |
|---|---|---|
| 02/24/20 | UCC-1 | My folks giving some weird feed back |
| 02/24/20 | OLIVER | On what? |
| 02/24/20 | UCC-1 | The new situation |
| 02/24/20 | OLIVER | For real what they say? |
| 02/24/20 | OLIVER | I gave some out before I made the move to make sure |
| 02/24/20 | UCC-1 | Two people said it made them trip out and paranoia instantly |
| 02/24/20 | OLIVER | That's crazy smh |
| 02/24/20 | UCC-1 | Other people said it's cool tho |
| 02/24/20 | OLIVER | I haven't had 1 complaint |
| 02/24/20 | OLIVER | Imma hit him up |
| 02/24/20 | OLIVER | I never heard that before ever |
| 02/24/20 | OLIVER | Shit seem the same & smelled the same |
| 02/24/20 | UCC-1 | Yeah they said everything else the same idk |
| 02/24/20 | OLIVER | Shit had me about to throw up |
| 02/24/20 | OLIVER | Imma hit him up |
| 02/24/20 | UCC-1 | Imma see what they say tomorrow |
| 02/24/20 | OLIVER | Same person same situation that's cracy |

24

| 02/24/20 | OLIVER | Fuck I'm mad I'm not home |
|---|---|---|
| 02/24/20 | UCC-1 | It's cool don't stress it |
| 02/24/20 | OLIVER | Because I don't wanna wait days to have to return it |
| 02/24/20 | OLIVER | I wonder what that's about tho |
| 02/24/20 | OLIVER | Shid that's a lot for that to be a issue |
| 02/24/20 | UCC-1 | Put a lot together |
| 02/24/20 | UCC-1 | But I think it's good fr |
| 02/24/20 | UCC-1 | Just maybe the new cut |
| 02/24/20 | UCC-1 | Idk |
| 02/24/20 | OLIVER | Hmmmmmmm shouldn't be that tho because I always use that |
| 02/24/20 | OLIVER | I don't be buying that high ass shit lol |
| 02/24/20 | OLIVER | How many ppl complained just 2? |
| 02/24/20 | UCC-1 | Yeah both said the same thing |
| 02/24/20 | OLIVER | That's weird as shit |
| 02/24/20 | OLIVER | I just hit him up tho |
| 02/24/20 | UCC-1 | Aite that's a bet |
| 02/24/20 | OLIVER | I'm about to see what my other folks think |
| 02/24/20 | OLIVER | That 1 person said a 10 |
| 02/24/20 | OLIVER | How many ppl you give it to |
| 02/24/20 | UCC-1 | 3 so far |
| 02/24/20 | UCC-1 | & 2 said no |
| 02/24/20 | OLIVER | Damn |
| 02/24/20 | OLIVER | I'm waiting for him to respond he might not hit me back til the morning tho |
| 02/24/20 | UCC-1 | Aite imma try to get some more feedback |
| 02/24/20 | OLIVER | That's crazy as shit tho I swear I've never heard that before |
| 02/24/20 | OLIVER | How much you use of it |
| 02/24/20 | UCC-1 | The normal 20 on 50 yeah it's weird af |
| 02/24/20 | OLIVER | Oh I thought you said you out a lot together |

65.    Through my knowledge of this investigation, during this exchange UCC-1 and OLIVER are discussing the quality of the pills that were made and complaints that various customers had made about their potency.   OLIVER talks about possibly returning the drugs

supplied back to their supplier. "The normal 20 on 50" is consistent with talking about the proportion of precursor ingredients and fentanyl used to mix and press pills.

66.     On March 18 and March 19, 2020, UCC-1 and OLIVER exchanged the following messages:

| DATE | FROM | MESSAGE |
|---|---|---|
| 03/18/20 | UCC-1 | You want me to come now? |
| 03/18/20 | OLIVER | Yea Bianca coming I can't leave this machine running lol |
| 03/18/20 | UCC-1 | Aite bet |
| 03/19/20 | UCC-1 | Imma get som lil joint from you tomorrow |
| 03/19/20 | OLIVER | Which 1's |
| 03/19/20 | OLIVER | & did you check that |
| 03/19/20 | UCC-1 | I'm tryna get a feedback now but 200 rp and idk how many 30's yet |
| 03/19/20 | OLIVER | I swear if they say they don't like that they lying |
| 03/19/20 | OLIVER | I got some food feedback so far |
| 03/19/20 | UCC-1 | Aite bet no complaints I think we good I'll have that at the crib if you want to pick it up tomorrow |
| 03/19/20 | OLIVER | Ok cool I'll be out early again prolyl |
| 03/19/20 | OLIVER | Try to keep the shit separate the hallucinating stuff |
| 03/19/20 | OLIVER | & the last stuff if you can |
| 03/19/20 | UCC-1 | Aite yeah it's still seperate |

67.     Through my knowledge of this investigation, during this exchange, OLIVER is talking about her "machine" running. "Machine" is believed to refer to a pill press. "200rp" and

"30's" refers to pills manufactured with fentanyl with markings consistent with prescription medications such as oxycodone.

68.     On March 29, 2020, UCC-1 and OLIVER exchanged the following messages:

| DATE | FROM | MESSAGE |
|---|---|---|
| 03/29/20 | UCC-1 | You got the lil 10's? |
| 03/29/20 | UCC-1 | Aite bet |
| 03/29/20 | UCC-1 | Add 200 more 30 with everything else |
| 03/29/20 | OLIVER | 550<br>300<br>200<br>350 |
| 03/29/20 | OLIVER | That's right? |
| 03/29/20 | UCC-1 | 450-30<br>600-rp<br>250-yellow |

69.     Through my knowledge of this investigation, during this exchange UCC-1 is asking about the availability of "10's." "10's" refers to pills with fentanyl with markings consistent with Oxycodone 10 mg pills. UCC-1 further orders "30", "rp", and "yellow" which refers to other pressed pills with markings consistent with oxycodone.

70.     On July 27, 2020, UCC-1 and OLIVER exchanged the following messages:

| DATE | FROM | MESSAGE |
|---|---|---|
| 07/27/20 | UCC-1 | Aye my nigg I was tryna to get a real response from people but they not liking that joint idk what's wrong with it you think your mans will take it back? |
| 07/27/20 | OLIVER | Which 1 |
| 07/27/20 | OLIVER | The 200? |
| 07/27/20 | OLIVER | How much you putting on it |
| 07/27/20 | OLIVER | & are you doing it how I said with that sift thing? |
| 07/27/20 | OLIVER | That shit had me sick af |

| 07/27/20 | OLIVER | I think they are going off color or something |
| 07/27/20 | OLIVER | I aint' have no complaints this time |
| 07/27/20 | OLIVER | My other mans said he gonna be back with that old torch we use to get tomorrow |
| 07/27/20 | UCC-1 | Aite that's bet but I'm doing 20 on 30 |
| 07/27/20 | UCC-1 | You think that's too much? |
| 07/27/20 | OLIVER | Hell no that's not to much |
| 07/27/20 | OLIVER | Are you sifting it tho? |
| 07/27/20 | OLIVER | You can't just blend because it's not gonna get all the way through it |

71.     Through my knowledge of this investigation, UCC-1 and OLIVER are discussing the manufacturing of pills with fentanyl and the use of a sifter to mix the ingredients.  OLIVER also confirms that she was reconnecting with a previous supplier of fentanyl.

(ii)     *UCC-1 iCloud messages with VENABLE*

72.     On July 14, 2019, UCC-1 and VENABLE exchanged the following messages:

| DATE | FROM | MESSAGE |
|------|------|---------|
| 07/14/19 | VENABLE |  |
| 07/14/19 | UCC-1 | Oh yeah I just picked the bread up imma hit you when I'm back on that side |

73. Through my knowledge of this investigation, along with my training and experience, the image sent by VENABLE is consistent with a kilogram of a controlled substance. "Bread" is common slang for money.

74. On July 15 and 16, 2019, UCC-1 and VENABLE exchanged the following messages:

| DATE | FROM | MESSAGE |
|---|---|---|
| 07/15/19 | UCC-1 | It a go!  My folks fucking with it |
| 07/15/19 | VENABLE | What they say |
| 07/16/19 | UCC-1 | If my folks come get this joint I'll have one left |
| 07/16/19 | VENABLE | I need you to grab another one so I can show my peoples we can move it to keep the ball rolling |

75. Through my knowledge of this investigation, UCC-1 advised VENABLE that his customers liked the quality of the substance ("my folks fucking with it").   VENABLE tells UCC-1 that he wanted to purchase an additional "one," believed to refer to a kilogram.

(iii)   *OLIVER iCloud Account*

76. The following table was found in the "Notes" section of an iCloud account associated with OLIVER:

| 18 | | Title: |
|---|---|---|
| | | Source: Apple iCloud Backup |
| | | Labels: |
| | | Body: 55-500<br>55-500<br><br>55-500<br>55-500<br><br>55-500 |

29

| | | | |
|---|---|---|---|
| | | | 55-500 |
| | | | 55-500<br>55-500 |
| | | | 55-500<br>55-500 |
| | | | |
| | | | 55-500<br>55-500 |
| | | | 55-500<br>55-500 |
| | | | 55-500<br>55-500 |
| | | | 55-500<br>55-500 |
| | | | 1100<br>200<br>20<br>30 blue |
| | | | 55-500<br>55-500 |
| | | | 55-500<br>55-500 |
| | | | 55-500<br>55-500 |
| | | | 55-500<br>55-500 |
| | | | 55-500<br>55-500 |
| | | | 60 white<br>6.3-6.5 sauce<br>3 lac<br>3 decal<br>2.5 blue<br>3 micro |
| | | | 55 white- 1100<br>3 lac- 60—<br>3 steric-60–<br>2.2 blue-44<br>3 micro-60— |
| | | | 600<br>15-lac<br>15-mag<br>15-micro |

| | | Blue-22 |
|---|---|---|
| | | 600<br>30-lac<br>30-mag<br>30-micro<br>22-blue<br><br>330<br>18 lac<br>18 decal<br>13.2 b<br>18 micro<br><br>300<br>15-lac<br>25-micro<br>15-mag<br>11 blue<br>50<br><br>275<br>20micro<br>2.2 blue<br>57<br><br>825<br><br>1650<br>300<br><br>**Parties:**<br><br><br>**Source file:**<br>20383139_Production_2010300634.zip/<br>20383139_Production_2010300634/APL<br>iC000003_APPLE_CONFIDENTIAL/100<br>71812631_270312/Notes/10071812631/<br>270312/eoliver202@icloud.com-<br>270312/Notes/B0213DA2-35B8-4C32-<br>A77A-AD1CF82A05D4/B0213DA2-<br>35B8-4C32-A77A-AD1CF82A05D4.txt :<br>0x0 (Size: 575 bytes) |

| 20 | | **Title:**<br><br>**Source: Apple iCloud Backup**<br><br>**Labels:** | |
|---|---|---|---|

| | | Body: 4-40<br>10-crystal<br>40-corn<br>40 caf<br><br>325 binder<br><br>Parties:<br><br><br><br>Source file:<br>20383139_Production_2010300634.zip/<br>20383139_Production_2010300634/APL<br>iC000003_APPLE_CONFIDENTIAL/100<br>71812631_270312/Notes/10071812631/<br>270312/eoliver202@icloud.com-<br>270312/Notes/EC648DCF-85C1-47A9-<br>B3B2-0D28685BD184/EC648DCF-<br>85C1-47A9-B3B2-0D28685BD184.txt<br>0x0 (Size: 42 bytes) | |
|---|---|---|---|

77.   Through my knowledge of this investigation, these notes are consistent with the production of pressed pills based on the conversion tables and the listing of precursor ingredients ("crystal", "corn", "caf", and "binder") and the corresponding proportions for each ingredient.

78.   The following image was found stored in the OLIVER iCloud download and is dated June 2, 2020:

| DATE | IMAGE |
|---|---|
| 06/02/20 |  |

79.     Through my knowledge of this investigation, this image is consistent with the information provided by CS-1 that, at his request, OLIVER removed approximately $330,000, from his residence on June 1, 2020 prior to the execution of a search warrant by law enforcement.

80.     OLIVER's iCloud download also included other documents and images including a lease agreement for her previously mentioned relative's Fort Washington, Maryland residence, a copy of the criminal complaint and bond appeal for CS-1, and a late notice from the apartment in Arlington, Virginia in the same complex where CS-1 previously lived, which is known to be the current residence of VENABLE.

(iv)    *VENABLE iCloud Account*

81.     On March 26, 2019, VENABLE and OLIVER exchanged the following messages:

| DATE | FROM | MESSAGE |
| --- | --- | --- |
| 03/26/19 | OLIVER | I sent 6k last time |
| 03/26/19 | OLIVER | Only made 2500 it wasn't worth the wait like shit |
| 03/26/19 | VENABLE | That niiga still aint' send them all |
| 03/26/19 | OLIVER | But if I want 1k he want all the $ upfront |
| 03/26/19 | OLIVER | Yes he owe |
| 03/26/19 | OLIVER | Well he said if I send 10k he would send 2k but I'm not sure if the offer still stand he acting like fag |
| 03/26/19 | OLIVER | I rather go get them @ this point for real |

82.     Through my knowledge of this investigation, VENABLE and OLIVER talk about six thousand dollars ($6,000) being sent to purchase a controlled substance. OLIVER advised VENABLE that if she sent ten thousand dollars ($10,000) "he" (an unknown supplier) would send "2k" (2,000) pills.

83.     On April 12, 2019, VENABLE and OLIVER exchanged the following messages:

33

| DATE | FROM | MESSAGE |
|---|---|---|
| 04/12/19 | OLIVER | & we might need to fuck with you ppls I'm tired of playing with this nigga |
| 04/12/19 | OLIVER | He holding up the $ |
| 04/12/19 | OLIVER | Do we gotta pay upfront out Phoenix? |
| 04/12/19 | VENABLE | He called early and was asking me when I was going to fly down |
| 04/12/19 | OLIVER | This point it's whatever |
| 04/12/19 | OLIVER | But we need to make sure they what they suppose to be |
| 04/12/19 | VENABLE | We get that shit right there when we pay |
| 04/12/19 | VENABLE | They goin have them ready for us |
| 04/12/19 | VENABLE | It's the same ones you be getting he sent me a pic |
| 04/12/19 | OLIVER | That don't mean nothing honestly |
| 04/12/19 | VENABLE | But I think they stronger |
| 04/12/19 | OLIVER | He said that? |
| 04/12/19 | OLIVER | They all gonna look the same pressed |
| 04/12/19 | VENABLE |  |

84.     Through my knowledge of this investigation, OLIVER and VENABLE are discussing the appearance and strength of pills they were planning to purchase. "Pressed" refers to the pills that are handmade as opposed to pharmaceutical grade.

85.     On May 16, 2019, VENABLE and OLIVER exchanged the following messages:

| DATE | FROM | MESSAGE |
|---|---|---|
| 05/16/19 | OLIVER | He sending 2k |

34

| 05/16/19 | OLIVER | Then another 2 |
| 05/16/19 | OLIVER | He claim 4K |
| 05/16/19 | VENABLE | When |
| 05/16/19 | OLIVER | Tomorrow 2k |
| 05/16/19 | VENABLE | He already sent it |
| 05/16/19 | OLIVER | Next 2 more |
| 05/16/19 | OLIVER | Yea |
| 05/16/19 | OLIVER | I got them info to see already |
| 05/16/19 | OLIVER | I can track already |
| 05/16/19 | OLIVER | Got em |
| 05/16/19 | OLIVER | & these join a lil darker this time also |
| 05/16/19 | VENABLE | Take a pic |
| 05/16/19 | OLIVER | Give me a second |
| 05/16/19 | OLIVER |  |

86.     Through my knowledge of this investigation, "2k" refers to two thousand (2,000) pills. OLIVER relates that pills were being shipped and she had a tracking number from the mailing service. They also discuss the appearance of the pills and the image is consistent with pills that were being obtained and further distributed by OLIVER and VENABLE.

87.     On June 28, 2019, VENABLE and OLIVER exchanged the following messages:

| DATE | FROM | MESSAGE |

| 06/28/19 | VENABLE | I'm tripping like shit I gave u to much money |
| 06/28/19 | OLIVER | 660 plus 700 plus whatever the cut was |
| 06/28/19 | OLIVER | Plus 300 |
| 06/28/19 | VENABLE | I gave u to much |
| 06/28/19 | VENABLE | You at [CS-1] house |
| 06/28/19 | VENABLE | I gave u 2000 |
| 06/28/19 | OLIVER | Yea |
| 06/28/19 | OLIVER | No I'm not |
| 06/28/19 | OLIVER | He just called me & said it's big police around there |
| 06/28/19 | OLIVER | Be on alert |

88.     Through my knowledge of the investigation, VENABLE gave OLIVER more money than what was owed for pills that he had received from her. VENABLE asks if OLIVER is at CS-1's residence during the conversation but she replies that she is not.

89.     On July 3, 2019, VENABLE and OLIVER exchanged the following messages:

| DATE | FROM | MESSAGE |
|---|---|---|
| 07/03/19 | VENABLE | Wassup with them blues you put together for sparks |
| 07/03/19 | OLIVER | Gotta go grab something so I can do that I didn't have nomore |

90.     Through my knowledge of the investigation, VENABLE is asking OLIVER about "blues" she manufactured for "Sparks." "Blues" refers to fentanyl pills that are blue in color and resemble Oxycontin pills and "Sparks" is a known nickname for UCC-1.

91.     On August 11, 2019, VENABLE and OLIVER exchanged the following messages:

| DATE | FROM | MESSAGE |
|---|---|---|
| 08/11/19 | OLIVER | But I'm about to put that thing to use I brought real soon |
| 08/11/19 | OLIVER | So we can have our own shit I'm tired of playing |
| 08/11/19 | VENABLE | I'm mad I ain't got no money for mine |
| 08/11/19 | OLIVER | It's 3 more things I gotta grab |
| 08/11/19 | OLIVER | Then we good |

92.     Through my knowledge of the investigation, OLIVER is referring her obtaining her own pill press to manufacture pills.

93.     On September 1, 2019, VENABLE and OLIVER exchanged the following messages:

| DATE | FROM | MESSAGE |
| --- | --- | --- |
| 09/01/19 | VENABLE | Call sparks |
| 09/01/19 | OLIVER | For what? |
| 09/01/19 | VENABLE | The machine |
| 09/01/19 | OLIVER | You ain't get it yet? |
| 09/01/19 | VENABLE | No |
| 09/01/19 | OLIVER | He a fuckin idiot |
| 09/01/19 | VENABLE | Who |
| 09/01/19 | OLIVER | Sparks |
| 09/01/19 | OLIVER | He could've brought the shit before he left he live across the street |

94.     Through my knowledge of the investigation, VENABLE asked OLIVER to call UCC-1 to get access to the pill press.

95.     Also on September 1, 2019, VENABLE and OLIVER exchanged the following messages:

| DATE | FROM | MESSAGE |
| --- | --- | --- |
| 09/01/19 | OLIVER |  |
| 09/01/19 | OLIVER | Them will go? |
| 09/01/19 | OLIVER | Prolly need a better punch |
| 09/01/19 | OLIVER | But the color or |

| 09/01/19 | OLIVER | *on |
| 09/01/19 | VENABLE | What a better stamp |
| 09/01/19 | OLIVER | Yea |
| 09/01/19 | VENABLE | All I want is my choker and watch I don't care bout shit else |
| 09/01/19 | OLIVER | I'm asking you about something you talking about a watch |
| 09/01/19 | VENABLE | The color is good boo |
| 09/01/19 | OLIVER | I got some shit 1 might be to weak 1 might be to strong |
| 09/01/19 | VENABLE | What u need me to do I just got in the house |
| 09/01/19 | OLIVER | What you mean? |
| 09/01/19 | VENABLE | You want me to get them check or what |
| 09/01/19 | OLIVER | Yea imma bring 5 with me |
| 09/01/19 | OLIVER | The joints I re did they said they good |

96.    Through my knowledge of the investigation, OLIVER talks with VENABLE about buying a better "punch" to imprint the pills to make them look more like the real prescription medications.

97.    On September 5, 2019, VENABLE and OLIVER exchanged the following messages:

| DATE | FROM | MESSAGE |
|---|---|---|
| 09/05/19 | OLIVER |  |
| 09/05/19 | OLIVER | They might be a lil bigger than normal but I can't tell because I don't have 1 |

| 09/05/19 | VENABLE | They look big |
|---|---|---|
| 09/05/19 | OLIVER | You asking or you telling me? |
| 09/05/19 | OLIVER | The M is off the M need to be smaller but this the only thing I got |
| 09/05/19 | OLIVER | Right now |
| 09/05/19 | VENABLE | I got one right here |
| 09/05/19 | OLIVER | Send me a pic |
| 09/05/19 | OLIVER | What I'm telling you tho is the M is already off |
| 09/05/19 | OLIVER | I have to get another dye punch so it can be smaller |
| 09/05/19 | VENABLE |  |
| 09/05/19 | OLIVER | It's nothing I can do about that |
| 09/05/19 | OLIVER | It's the same M lol |
| 09/05/19 | OLIVER | I'm saying it's the same as the M I gave you the other day |
| 09/05/19 | OLIVER | I didn't change that |
| 09/05/19 | VENABLE | Oh ok |
| 09/05/19 | OLIVER | Just changed the size a Lil bit so it can press that M better |
| 09/05/19 | OLIVER | Because when they was thinner the M was looking like them 1s I gave you |
| 09/05/19 | VENABLE | Oh ok so what u need now |
| 09/05/19 | OLIVER | Nothing I'm doing it they will be ready I'm the morning |
| 09/05/19 | OLIVER | The 500 at least |
| 09/05/19 | VENABLE | Ok I can help if u want me to |
| 09/05/19 | VENABLE | We need 5000 |
| 09/05/19 | OLIVER | Oh trust me I know lol |
| 09/05/19 | OLIVER | I'm working like shit I been @ this all day smh |
| 09/05/19 | OLIVER | & I feel like I gotta throw up fuckin with this shich smh Lls |
| 09/05/19 | VENABLE | Put a damn mask on girl |
| 09/05/19 | OLIVER | It's my hands I got a mask |

98.     Through my knowledge of the investigation, OLIVER sent images of pills that she

manufactured and her and VENABLE are discussing the quality of the imprint of the letter "M."

OLIVER advises VENABLE that she had manufactured five hundred (500) pills and was feeling sick, most likely from exposure to fentanyl while pressing pills.

99.    On September 6, 2019, VENABLE and OLIVER exchanged the following messages:

| DATE | FROM | MESSAGE |
|------|------|---------|
| 09/06/19 | OLIVER | Working on it |
| 09/06/19 | OLIVER | Color off |
| 09/06/19 | OLIVER | But they small |
| 09/06/19 | OLIVER | That 1 you gave me was 1 I did right? |
| 09/06/19 | OLIVER |  |
| 09/06/19 | VENABLE | I'm about to drop these joints off |
| 09/06/19 | VENABLE | I'm waiting on u |
| 09/06/19 | OLIVER | How about I Give you like 100 To see what they gonna say I don't even wanna waste my time If they don't like them if not then I'll wait til the other stuff come tomorrow |
| 09/06/19 | VENABLE | Ok |
| 09/06/19 | VENABLE | Long thy small and the stamp on them |
| 09/06/19 | VENABLE | Them other ones ain't come yet |
| 09/06/19 | OLIVER |  |
| 09/06/19 | OLIVER | Some a lil ashy because the shit keep getting tuck on it |

| 09/06/19 | VENABLE | How the size |
|---|---|---|
| 09/06/19 | OLIVER | Size good |
| 09/06/19 | OLIVER | But some you can't see the M |
| 09/06/19 | OLIVER | I'm not even about to keep |
| 09/06/19 | VENABLE | What u want me to do |
| 09/06/19 | OLIVER | Honestly they just look old |
| 09/06/19 | OLIVER | But you said the other dude wasn't fuckin with it |
| 09/06/19 | VENABLE | Yea because they was big |
| 09/06/19 | OLIVER | What about the M tho |
| 09/06/19 | VENABLE | The M was cool the pills was big |
| 09/06/19 | OLIVER | Now the M not cool is what I'm saying |
| 09/06/19 | OLIVER | Some are some not |
| 09/06/19 | OLIVER | The shit keep Getting stuck |
| 09/06/19 | OLIVER |  |

100.    Through my knowledge of the investigation, OLIVER is further discussing manufacturing pills and having difficulties with the pill press and items getting "stuck."

101.    On November 10, 2019, VENABLE and OLIVER exchanged the following messages:

| DATE | FROM | MESSAGE |
|---|---|---|

| 11/10/19 | OLIVER | I'm in here with sparks lol |
|---|---|---|
| 11/10/19 | OLIVER | Prolly about to leave in a second I don't feel good |
| 11/10/19 | OLIVER | When tye come I DNT want her to see him she prolly think he gonna tell [CS-1] but he not |
| 11/10/19 | OLIVER | I'm tryna make like 5k of them but I gotta get the other shit which will be like 3,000 |
| 11/10/19 | VENABLE | What other shit |
| 11/10/19 | OLIVER | To out with it |
| 11/10/19 | OLIVER | Put |
| 11/10/19 | VENABLE | So u can't make nomore |
| 11/10/19 | OLIVER | Yes just not 5k yet |
| 11/10/19 | VENABLE | Them lil 500 ain't shit girl |
| 11/10/19 | OLIVER | I know |
| 11/10/19 | OLIVER | That shit keep making me sick smh |
| 11/10/19 | VENABLE | Use mask and gloves |
| 11/10/19 | OLIVER | I do 2 mask |
| 11/10/19 | OLIVER | & gloves |
| 11/10/19 | OLIVER | Still sick smh |
| 11/10/19 | OLIVER | That shit different |

102.    Through my knowledge of the investigation, OLIVER tells VENABLE she is trying to manufacture up to five thousand (5,000) pills at a time and she again refers to becoming ill due to exposure to fentanyl during the process.

103.    On December 2 and 3, 2019, VENABLE and OLIVER exchanged the following messages:

| DATE | FROM | MESSAGE |
|---|---|---|
| 12/02/19 | VENABLE | U check on [CS-1] |
| 12/02/19 | OLIVER | Ctfu he in the house |
| 12/02/19 | OLIVER | Your ass gonna have to starting giving me half of what I spend to |
| 12/02/19 | VENABLE | You want the money I got up here for you |
| 12/02/19 | VENABLE | You using the real one that u got far as size |
| 12/02/19 | OLIVER | Yea lol |
| 12/02/19 | OLIVER | Why they complaining about that to |

| 12/02/19 | VENABLE | No |
|---|---|---|
| 12/02/19 | OLIVER | These 1s way better |
| 12/02/19 | VENABLE | Let me see |
| 12/02/19 | OLIVER | Wayyyyy Harder no homo |
| 12/02/19 | OLIVER | You want me to come up there |
| 12/02/19 | VENABLE | Yea |
| 12/03/19 | OLIVER | His friend just annoyed tf out of me |
| 12/03/19 | OLIVER | I'm already not making a lot off this shit I be paying him & be paying for this other shit he had the nerve to act like he got a attitude |
| 12/03/19 | OLIVER | For some 10's this shit dumb af |
| 12/03/19 | OLIVER | Yea imma do this shit myself |
| 12/03/19 | VENABLE | So what he ask for more money |
| 12/03/19 | OLIVER | Nah he just dumb as shit |
| 12/03/19 | OLIVER | After I just spent 3k tryna do all this shit |
| 12/03/19 | OLIVER | This shit ain't even gonna make me my $ back I'm mad af right now |
| 12/03/19 | VENABLE | I'm on the way back there |
| 12/03/19 | VENABLE | Making money |
| 12/03/19 | VENABLE | You need to get ur ass to work |

104.   Through my knowledge of the investigation, VENABLE asks OLIVER about checking on CS-1 and then agrees to bringing her money for pills that were "fronted" to her.

105.   On January 14, 2020, VENABLE and OLIVER exchanged the following messages:

| DATE | FROM | MESSAGE |
|---|---|---|
| 01/14/20 | OLIVER |  |
| 01/14/20 | VENABLE | What u think |
| 01/14/20 | OLIVER | Idk |
| 01/14/20 | OLIVER | I really don't wanna order this shit I think they on bs |
| 01/14/20 | OLIVER | But I mean we can try |
| 01/14/20 | OLIVER | Price went down a lil bit |
| 01/14/20 | VENABLE | Man Oder the shit |
| 01/14/20 | OLIVER | I already be spending enough $ |
| 01/14/20 | VENABLE | Which one u trying Oder |
| 01/14/20 | OLIVER | Prolly the last 1 he got the the quickest shipping |
| 01/14/20 | VENABLE | It don't say the purity |
| 01/14/20 | OLIVER | I wrote him to see |

| 01/14/20 | VENABLE | How long it takes |
|----------|---------|-------------------|
| 01/14/20 | OLIVER | That 1 2 days |
| 01/14/20 | OLIVER | Others 6 days |
| 01/14/20 | OLIVER | The other ppl is 6 days |
| 01/14/20 | OLIVER | He still ain't call back I done told a couple ppl I was gonna have it |
| 01/14/20 | OLIVER | Now they blowing me up smh |

106.    Through my knowledge of the investigation, OLIVER sent VENABLE an image of "dark web" advertisements for carfentanil. They also discuss the time frame of receiving a shipment and customers "blowing up" OLIVER to make purchases.

107.    The following images were found stored in the VENABLE iCloud download on July 22, 2020:



| DATE | IMAGE |
|------|-------|
| 07/22/20 | |
| 07/22/20 | |

108.    Through my knowledge of the investigation, these images are consistent with pressed pills being manufactured.

109.    The following image was found stored in the VENABLE iCloud download on August 3, 2020:

| DATE | IMAGE |
|------|-------|
| 08/03/20 |  |

110.    Through my knowledge of the investigation, these images are consistent with pressed pills being manufactured.

111.    The following image was found stored in the VENABLE iCloud download on September 3, 2020:

| DATE | IMAGE |
|------|-------|



09/03/20

112.    Through my knowledge of the investigation, these images are consistent with pressed pills made to resemble Percocet.

L.    Seizure of $14,300 from OLIVER on January 8, 2021

113.    On or about January 8, 2021, in Arlington, Virginia, officers stopped a vehicle for suspicion of an intoxicated driver. The driver and sole occupant of the vehicle was identified as OLIVER.   OLIVER failed her field sobriety tests and was subsequently taken into custody. A search of her vehicle resulted in the seizure of $14,300 in U.S. currency. Law enforcement also observed copies of courts filings in the Eastern District of Virginia pertaining to CS-1 and CS-2.

## CONCLUSION

114.    Based on the foregoing facts, there is probable cause to believe that from in or about April 2019 through the present, in the Eastern District of Virginia and elsewhere, the defendants, Ericka Sheree OLIVER, also known as "Chip," and Taurean Alphonso VENABLE, also known as "Tip" did knowingly, unlawfully, and intentionally combined, conspired, confederated, and agreed with others, both known and unknown, to distribute 400 grams or more of a mixture and

substance containing a detectable amount of fentanyl, in violation of Title 21, United States Code,

Sections 841(a)(1) and 846.

*STACEY IVIE*

Stacey Ivie
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to in accordance with Fed. R. Crim. P. 4.1 by telephone on this
_____ day of February, 2021.

_____ /s/ _____
John F. Anderson
United States Magistrate Judge
The Honorable John F. Anderson
United States Magistrate Judge

48

**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

IN THE MATTER OF THE SEARCH OF:

BLACK 2014 CHEVROLET CRUZE LS     Case No. 21-sw-47
WITH FLORIDA LICENSE PLATE
PK957D AND VIN #1G1PA5SG937283380

### AFFIDAVIT IN SUPPORT OF SEARCH AND SEIZURE WARRANT

I, Jerrod C. Hughes, being first duly sworn, depose and states as follows:

### AFFIANT'S BACKGROUND AND EXPERIENCE

1.     I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code Section, 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for the offenses enumerated in Section 2516 of Title 18, United States Code.

2.     I have been a sworn police officer with the Metropolitan Washington Airports Authority Police Department (MWAAPD) since January 2001. I have been assigned to the Criminal Investigations Section as a Detective since January 2008 and have investigated numerous types of crimes, including but not limited to fraud, money laundering, narcotics and organized crime. I have conducted and/or participated in numerous narcotics investigations resulting in the arrest and/or conviction of drug distributors and the seizure of quantities of controlled substances and other evidence affiliated with drug distribution   I am currently assigned to the DEA Group Thirty-Three at the Washington Division Office, located in Annandale. VA.  I have investigated, and assisted in the investigation of many narcotics traffickers and possessors.  I have previously participated in investigations which have led to the arrest and conviction of narcotics dealers and money launderers.

1

3.       Since 2001, I have received training and experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, surveillance, undercover operations, operations involving cooperating sources, and a variety of other investigative tools available to law enforcement officers.  In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of proceeds derived from the sale of narcotics, and the organization of drug conspiracies.  In the course of conducting these investigations, I have been involved in the use of the following investigative techniques, among others: interviewing informants and cooperating sources; conducting physical surveillance; conducting short-term and long-term undercover operations, including reverse undercover operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification data; conducting court-authorized electronic surveillance; preparing and executing search warrants which have led to substantial seizures of narcotics, firearms, contraband, and drug related assets; and analysis of financial documents and records.

4.       During my time as a law enforcement officer, I have become knowledgeable about the methods and modes of narcotics operations, and the language and patterns of drug use and trafficking.  I have gained knowledge in the use of various investigative techniques including the use of wiretaps, physical surveillance, undercover agents, confidential informants and cooperating witnesses, the controlled purchases of illegal narcotics, electronic surveillance, consensually monitored recordings, investigative interviews, financial investigations, the service of Grand Jury Subpoenas, and the execution of search and arrest warrants.

5.       Based on my training and experience, I know that individuals involved in criminal activities will often communicate with their associates before, during, or after the crime by using

cellular telephones and that communication can be made through either verbal conversation, third party communication applications, or through the use of text messages between the two communicating parties' cellular telephones or other devices. It is also commonly understood and known that many people in our society communicate with their cellular telephones and other devices in both manners.

6.      Based on my training and experience, I also know that information gained through the obtaining of data stored in the cellular telephone and other devices routinely referred to as an address book or contacts file in an individual's cellular telephone and other devices, as well as the recovery of text messages sent or received from that cellular telephone and other devices can lead to identifying accomplices or witnesses to the crimes committed by the individual.

7.      Based on my training and experience, I also know that individuals frequently maintain personal records and documents in an electronic format on laptop computers and/or smart phones. Further, based on my training and experience in executing court-authorized search warrants, I also know that drug traffickers commonly maintain at their residences and on their property, including in their vehicles, additional quantities of the illicit drugs being distributed. These drugs may be concealed in locations known to the traffickers to avoid law enforcement detection. Drug traffickers also commonly maintain at their residences and on their property, including in their vehicles, paraphernalia for packaging, processing, diluting, weighing and distributing controlled substances.

8.      Based on my training and experience in executing court-authorized search warrants, I know that drug traffickers often amass large proceeds from the sale of controlled substances and attempt to legitimize these profits, often utilizing domestic banks and their attendant services, securities, cashier's checks, money orders, letters of credit, brokerage houses,

3

real estate, shell corporations, and business fronts. When drug traffickers amass large proceeds from the sale of controlled substances, they often keep large amounts of United States currency within their residences to conceal it from law enforcement.

9.     Based on my training and experience in executing court-authorized search warrants, I also know that drug traffickers commonly maintain at their residences money ledgers and other documents, which note the price, quantity, date and/or times when controlled substances were purchased, possessed, transferred, distributed, sold or concealed, or when money was possessed or transferred.

10.    Based on my training and experience in executing court authorized search warrants, I also know that drug traffickers commonly own firearms to protect themselves, their profits, and their narcotics from others while engaging in the illegal activity of distributing narcotics.

11.    The facts and information contained in this affidavit are based upon my personal knowledge of the investigation and information obtained from other state and federal law enforcement officers.

12.    Wherever in this affidavit I discuss information resulting from physical surveillance conducted in this investigation, that information, except where otherwise indicated, does not set forth my own personal observations, but rather that which has been provided directly or indirectly to me through other law enforcement officers who made such observations.

13.    This affidavit contains information necessary to support probable cause. The information contained in this affidavit is not intended to include each and every fact and matter observed by me or known to the government.

## REQUESTED SEARCH WARRANT

14.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the vehicle further described as a black 2014 Chevrolet Cruze LS with Florida license plate PK957D with VIN# 1G1PA5SG937283380 (hereinafter the TARGET VEHICLE), further described in Attachment A, for the items described in Attachment B.

15.     Based on the facts set forth in this affidavit, there is probable cause to believe that evidence of criminal violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances) and 846 (conspiracy to distribute controlled substances) will be located in the TARGET VEHICLE, which was used by Ericka Sheree OLIVER, a/k/a "Chip" (hereinafter, "OLIVER").

## PROBABLE CAUSE

A.     Background of the Investigation

16.     In early 2020, law enforcement obtained information about subjects distributing quantities of controlled substances in the Eastern District of Virginia and elsewhere.  During the course of this investigation, law enforcement has seized large quantities of fentanyl and other controlled substances, along with corresponding evidence that identified OLIVER as conspiring with others to distribute controlled substances.

17.     On February 8, 2021, law enforcement sought a criminal complaint and arrest warrant for OLIVER, charging her and a co-conspirator with conspiracy to distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.  The Complaint and Affidavit in Support of the Criminal Complaint are attached hereto as Exhibit 1 and incorporated by reference.

18.     As evidenced in Exhibit 1, the investigation revealed that OLIVER has utilized cellular devices extensively to facilitate her drug trafficking.  Messages sent and received by OLIVER involving drug trafficking were derived from co-conspirator's phones (Exhibit 1, ¶¶ 30-47, 55-60), co-conspirator's iCloud accounts (Exhibit 1, ¶¶ 62-71, 81-106), and OLIVER's iCloud account (Exhibit 1, ¶¶ 76-79).

B.     Arrest of OLIVER in Washington, D.C.

19.     On February 9, 2021, law enforcement executed search warrants on two residences associated with OLIVER in the District of Maryland, and made efforts to locate OLIVER and take her into custody.  During the execution of the warrant at what was believed to be OLIVER's primary residence, law enforcement seized numerous suspected fentanyl pills, a money counter, and packaging consistent with precursor ingredients utilized in manufacturing pills.

20.     Pursuant to a prior warrant and Order in the Eastern District of Virginia, law enforcement was monitoring cell phone location data for OLIVER using cellular telephone number 202-***-2424.  A 2020 federal search warrant for an un-indicted co-conspirator's (UCC-1) Apple records had revealed communications between UCC-1 and OLIVER, who began using phone 202-***-2424, in June 2020.  In my training and experience, it is common for narcotics traffickers to change phone numbers in order to thwart law enforcement detection.  In the messages, OLIVER identified herself as "Chip, and law enforcement reviewed the materials provided by Apple, which included iMessages, chats, SMS, MMS, images, and other data.  During the review of the downloaded contents, several messages were located between OLIVER and UCC-1 which were indicative of suspected drug trafficking and corroborated other details of the criminal conspiracy. In addition, call detail records for 202-***-2424 revealed continued communications between OLIVER and previously identified co-conspirators in this investigation, up to an including

February 8, 2021.  On February 9, 2021 the electronic monitoring indicated that OLIVER had left her Maryland residence around approximately 03:00 hours on February 9, 2021 and traveled to the Rosewood Hotel, located at 1050 31st Street, NW, Washington, D.C. 20007.  GPS data indicated that OLIVER was in the area of the Rosewood Hotel.

21.     Law enforcement verified with management at the Rosewood Hotel that OLIVER had checked in early in the morning on February 9, 2021, and ascertained a room number of 407.

22.     Law enforcement knocked on the door to 407 and identified themselves in order to make contact with OLIVER and take her into custody on the outstanding arrest warrant.  After a delay, OLIVER opened the door and stepped into the hallway.  The door to the room shut and locked behind her, and she did not have a key for the room on her person.  OLIVER had a small wallet with some credit cards and her license on her person, and indicated that her cell phone was inside the room.  When asked if she wanted to retrieve her cell phone, or any other property from the room, before she was transported away from the hotel, OLIVER declined.  She also declined to give law enforcement consent to search the room.

23.     Law enforcement observed that OLIVER's shirt cuffs were wet.  When asked about it, OLIVER indicated that she had been sick and throwing up, and that was why her cuffs were wet.  In my training and experience, subjects being taken into custody will try to discard evidence by either flushing it down a toilet or washing it down the sink.  OLIVER was taken into custody and transported to the Alexandria Adult Detention Center, and law enforcement maintained the exterior of the hotel room in anticipation of a search warrant.

24.     Law enforcement also learned that when OLIVER checked in on February 9, 2021, she had valeted the TARGET VEHICLE, which was parked in the parking garage of the hotel.

25.     On February 10, 2021, Detective Briant (who is employed by the Fairfax County Police Department), and his K-9 "Storm" responded to the hotel and conducted a "sweep" of the TARGET VEHICLE which resulted in a positive alert for the possible presence of a controlled substance.   Detective Briant and "Storm" were trained by the United States Customs and Border Protection Canine Program and have received basic training in the detection of odors of cocaine and its derivatives, marijuana and its derivatives, heroin and its derivatives, methamphetamine and its derivatives, and Ecstasy.  Detective Briant and "Storm" were certified on December 12, 2018 by the United States Customs and Border Protection Canine Program as a controlled substance detection canine team and their certification was renewed on October 16, 2020 and remains current.

26.     Law enforcement secured the TARGET VEHICLE in a secure location in Washington, D.C. in anticipation of seeking a search warrant.  The vehicle is unoccupied at this time.

C.     Search Warrant executed at Rosewood Hotel

27.     On February 10, 2021, law enforcement executed a federal search warrant (United States District Court for the District of Columbia, case number 21-sw-42) on Room 407.  During the execution of the search warrant, law enforcement seized two (2) cellular phones that had been returned to factory settings, jewelry valued in excess of $60,000, and $58,900 in U.S. currency. Law enforcement also noted that there appeared to be an unknown substance in the toilet, appeared to be clogged.  The bathroom was positioned near the entry door to the room, and a sample of the water/substance from the toilet was taken to be sent for laboratory analysis.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

28.     As described above and in Attachment B, this application seeks permission to search for records that might be found in the TARGET VEHICLE, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

30.     *Probable cause.*  I submit that if a computer or storage medium is found in TARGET VEHICLE, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.   Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.   Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.   Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used,

what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

> d.   Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

31. *Forensic evidence.*   As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence will be on any storage medium in TARGET VEHICLE because:

> a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.   Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.   Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files

were created and the sequence in which they were created, although this information can later be falsified.

b.      As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated

11

into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not

present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

32. *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant.  In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a. The time required for an examination.  As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the

search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data at the TARGET VEHICLE.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.      Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

33.    *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## **CONCLUSION**

34.     Based on the foregoing, which includes Exhibit 1, I submit that there is probable cause to believe that OLIVER and other individuals, both known and unknown, conspired to distribute and possess with the intent to distribute controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.  Furthermore, there is probable cause to believe that evidence and instrumentalities of the crimes described herein and as set forth more fully in Attachment B to the warrant application, incorporated herein by reference, are contained or secreted within the TARGET VEHICLE.

Respectfully submitted,

*Jerrod C. Hughes A336*
_____
Jerrod C. Hughes
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on February 12, 2021.

_____
ROBIN M. MERIWEATHER
United States Magistrate Judge

15